530 A.2d 871

**Tanya J. DeMASI,**

v.

**Rocco J. DeMASI, Appellant.**

**Rocco J. DeMASI, Appellant,**

v.

**Tanya J. DeMASI (Two Cases).**

**Rocco J. DeMASI,**

v.

**Tanya J. DeMASI, Appellant.**

Superior Court of Pennsylvania.

Argued May 21, 1986.

Filed Aug. 10, 1987.

Petition for Allowance of Appeal Denied March 2, 1988.

24

26

Kenneth J. Sparler, York, for Rocco DeMasi.

Carolyn Lasky, York, for Tanya DeMasi.

Before CIRILLO, President Judge, and TAMILIA and HESTER, JJ.

HESTER, Judge:

■ These are four consolidated appeals: three filed by Rocco J. DeMasi, and one filed by Tanya J. DeMasi. As both parties are appellant and appellee, we shall refer to Rocco J. DeMasi as "husband" and to Tanya J. DeMasi as "wife." The orders under review concern child support, spousal support, alimony pendente lite, equitable distribution of marital property, counsel fees and litigation expenses.[1]

1. We note several errors in the form of wife's brief: omission of the statement of jurisdiction (Pa.R.A.P. 2111(a)(1)); statement of questions not set forth on a separate page nor limited to one page

Husband and wife were married on November 25, 1967. Two children were born of their marriage: Vincent M. DeMasi, born December 14, 1970, and John M. DeMasi, born November 23, 1974.

Husband is a medical doctor who graduated from Temple Medical School in 1969. Following an internship and residency, he earned board certification in internal medicine in 1972. He is a 50% shareholder in Associated Internists, Inc., where he primarily practices rheumatology. The owner of the remaining shares is his practicing colleague, William Lampe, M.D.

Wife is a registered nurse and worked in that capacity from 1967 to 1970. From 1970 to 1982, she raised the parties' children and served as a full-time homemaker. She returned to work as a registered nurse in 1982 when the parties separated.

Husband and wife separated on September 10, 1982, and wife filed a support complaint on September 17, 1982. On September 28, 1982, husband filed a complaint in divorce to which wife responded with an answer and claims for alimony pendente lite, counsel fees, costs, alimony and equitable distribution.

Following numerous and lengthy hearings, the trial court, on July 9, 1985, ordered husband to pay wife $130.00 per week as alimony pendente lite and $264.00 per week as support for sons Vincent and John. Vincent moved in with his father on October 26, 1984, and child support was reduced to $130.00 per week as of that date. Husband appealed from the July 9, 1985 order for alimony pendente lite and child support. The parties were divorced on August 6, 1984, while alimony and equitable distribution claims were pending.

On September 4, 1985, the court entered an order disposing of the remaining claims. Husband was awarded his

(Pa.R.A.P. 2116(a)); brief exceeds maximum length (Pa.R.A.P. 2135(1)). Wife's preamble requesting this court's indulgence in studying her lengthy brief is procedurally incorrect; parties shall present a motion for leave of court to file briefs exceeding maximum length.

entire interest in Associated Internists, Inc. Wife was awarded husband's entire pension interest, the net equity in the marital residence, all household goods in the marital residence, the personal property in her possession, an automobile, a private life insurance policy, alimony of $7,500.00, partial payment of counsel fees and full payment of expert fees and court costs. Both parties appealed from the order of September 4, 1985.

Finally, on March 4, 1986, after appeals were filed from the two orders outlined above, the trial court denied husband's petition to reduce or to terminate alimony pendente lite on grounds that wife had remarried. Husband appealed from the March 4 order.

Husband raises eight arguments in his appeals; wife raises three arguments in her appeal. Husband argues that 1) the trial court entered its order for spousal support, child support and alimony pendente lite without giving him the opportunity to testify concerning his income and earning capacity; 2) the trial court failed to consider the needs of the children and financial abilities of husband and wife in establishing support; 3) the trial court failed to consider wife's income and earning capacity in establishing support; 4) the trial court erred in viewing husband's business perquisites as income; 5) the trial court erred in ordering husband to pay mortgage installments and other expenses on the marital residence after wife moved from the premises; 6) the trial court erred by including good will in the value of husband's medical practice; 7) the trial court erred in continuing alimony pendente lite without considering wife's income, earning capacity and remarriage; and 8) the trial court erred in awarding spousal support and alimony pendente lite in excess of one-third of husband's income.

Wife argues in her cross appeal that 1) the trial court erred in not finding $19,800.00 in medical insurance proceeds to be marital property; 2) the trial court erred in valuing husband's pension interest at $26,960.00; 3) the trial court erred in holding that it lacked jurisdiction to distribute certificates of deposit which wife owned jointly

with her children; and 4) wife remained entitled to lump sum alimony of $7,500.00 despite her remarriage.

## HUSBAND'S APPEAL

### Support and Alimony Pendente Lite

First, husband complains that during the hearing on child support, spousal support and alimony pendente lite, he was not permitted to testify concerning his income and earning capacity. According to husband, the support and alimony pendente lite orders were based on the master's report, not on the court's separate findings.

Pennsylvania Rule of Civil Procedure 1910.11 states that actions for support may begin by an office conference conducted by a hearing officer. Following a review of income tax returns, pay stubs and income and expense statements, the officer may make a recommendation. If an agreement is not reached at the conference, the court may enter an order on the recommendation. Thereafter, if the aggrieved party files a written demand, a hearing de novo shall be held before the court.

An office conference was conducted on December 2, 1982. A recommendation was made, an order was entered and both parties demanded a de novo hearing. The hearing was conducted on April 25, 1983. Wife was the only witness, and it is not clear whether husband elected to forgo testifying or was precluded from testifying.

The support and alimony pendente lite order under review is dated July 9, 1985. That order was not based solely on the hearing of April 25, 1983. Four hearings concerning reconsideration or modification of support and alimony pendente lite followed the April, 1983 hearing. Moreover, seven hearings concerning equitable distribution had been conducted by a master. During the subsequent hearings, husband had an opportunity to testify, call witnesses, offer documentary evidence and cross-examine witnesses. In fact, husband and other witnesses provided exhaustive information concerning his income and the income and ex-

penses of his professional corporation. Among the corporate expenses examined were pension plan contributions, salaries, insurance premiums, travel and entertainment, seminars, automobiles, equipment, taxes, depreciation and general overhead expenses. This information sufficiently defined husband's income and earning capacity.

■ Husband incorrectly states that the court merely adopted the master's findings and report in establishing support and alimony pendente lite. Transcripts from the seven equitable distribution hearings were part of the record and available for the court's review. The court made its own findings after a review of testimony taken at the support hearings and the hearings before the master. The court did not adopt the master's findings and report. Moreover, the fact that husband had filed exceptions from the master's report, which were pending when the order for support and alimony pendente lite was entered, did not preclude the court from relying on the evidence elicited at the master's hearings.

Husband cites *Groner v. Groner*, 328 Pa.Super. 191, 476 A.2d 957 (1984), and *Agosti v. Agosti*, 319 Pa.Super. 426, 466 A.2d 233 (1983), to support his argument that he was entitled to present evidence of his income and earning capacity at the hearing de novo. In *Agosti, supra,* child support was ordered following a hearing on divorce, alimony, custody and equitable distribution. The court had not notified the parties that child support would be considered with these other claims; therefore, the parties did not present evidence relevant to child support. Accordingly, the *Agosti* court remanded for an evidentiary hearing on child support.

In *Groner, supra,* child support was determined without a hearing even though a de novo hearing had been requested by the father. We held that Pa.R.C.P. 1910.11(i) provided an absolute right to a de novo hearing on child support once properly requested. We also held that a trial court may not rely on the record of other claims in lieu of a hearing de novo on child support.

Here, husband requested a hearing de novo on child support and alimony pendente lite, and such a hearing was conducted on April 25, 1983. Husband was present at the hearing with counsel, but he complains that he was precluded from testifying. The record does not indicate that husband moved to provide testimony or that he was denied the opportunity. It appears that husband's strategy was not to testify.

■ Although the trial court relied upon evidence from hearings on claims other than child support, these hearings addressed income and earning capacity. In *Agosti*, child support issues were not addressed to any extent in the hearings. In *Groner*, the parties' son was mentally retarded, and there was no evidence regarding the extent of his retardation or the effect it had on the amount of support. The hearing on claims other than child support did not address the child's mental retardation; therefore, a de novo hearing was the last opportunity to do so. Here, all issues relevant to child support were addressed in numerous hearings. The court properly relied on evidence from those other hearings to determine child support because husband already had the opportunity to testify on his income and earning capacity at the de novo hearing on April 25, 1983.

■ Next, husband argues that the trial court failed to follow the guidelines enunciated in *Melzer v. Witsberger*, 505 Pa. 462, 480 A.2d 991 (1984), in determining child support. In *Melzer*, the supreme court summarized guidelines for calculating child support: 1) reasonable needs of the children which reflect the needs, custom and financial status of the parents; 2) respective abilities of the parents to provide support which are identified in part by reasonable living expenses; 3) use of a formula to calculate each parent's total support obligation; and 4) credit for support provided directly to the children.

Husband maintains that *Melzer* was not followed because the court allegedly based the support order on the master's equitable distribution report without conducting a comprehensive support hearing covering the *Melzer* guidelines.

As discussed above, the support and equitable distribution hearings were exhaustive; the needs of the children and the financial abilities of husband and wife were fully addressed. Wife testified concerning utilities, clothing, automobile maintenance, indebtedness, insurance, taxes, medical and dental treatment, food, entertainment, subscriptions and other typical and special living expenses for her and the children. Similarly, husband's expenses were fully covered. Finally, the parties' health, education, skills, actual and prospective incomes, and career plans and opportunities were addressed. This information was gleaned from the record. It was not, as husband maintains, taken from the master's report.

Third, husband argues that the trial court erred in not considering wife's income and earning capacity in determining child support and alimony pendente lite. According to husband, wife can earn in excess of $24,000.00 annually as a registered nurse.

Both parents are equally responsible for supporting their children, and the extent of their respective support obligations is determined by their capacity and ability. *Fee v. Fee*, 344 Pa.Super. 276, 496 A.2d 793 (1985). A parent's ability to pay support is determined primarily by financial resources and earning capacity. *Hesidenz v. Carbin*, 354 Pa.Super. 610, 512 A.2d 707 (1986); *Commonwealth ex rel. Cochran v. Cochran*, 339 Pa.Super. 602, 489 A.2d 804 (1985). The obligation of support, then, is measured more by earning capacity than by actual earnings. *Hesidenz, supra.*

Wife testified at length concerning her employment history and qualifications. She graduated from Temple University School of Nursing in 1967 as a registered nurse. From September, 1967, to October, 1970, she served several hospitals and one school district as a nurse. In October, 1970, she left the workforce in anticipation of Vincent's birth in December, 1970.

From October, 1970, to September, 1982, wife remained in the home to rear the parties' sons and to serve as full-time

homemaker. Due to husband's substantial income, the parties had the opportunity to provide their children with fulltime parental care during the nurturing years. Also during this twelve-year period, wife entertained other physicians in her home and served the Women's Medical Auxiliary, Junior League, Young Women's Club and Parent Teacher Organization. Wife explained that she entertained house guests and joined these organizations to create and maintain good public relations for husband.

In 1983, her first full year back in the work force, wife earned $15,000.00. On May 1, 1984, she began employment as the director of nursing for a nursing home and rehabilitation center at $22,000.00 annually. Her director's position would continue provided she completed a bachelor's degree in behavioral science. As of June 1, 1984, wife had to complete thirty-five credits to earn this degree.

■ In *Ritter v. Ritter*, 359 Pa.Super. 12, 518 A.2d 319 (filed December 5, 1986, at 283 Philadelphia 1986), we iterated the scope of review in child support proceedings: a child support order will not be reversed unless the evidence was insufficient or the court abused its discretion in awarding that amount of support. An abuse of discretion is proven only by clear and convincing evidence. *Koller v. Koller*, 333 Pa.Super. 54, 481 A.2d 1218 (1984).

■ With this standard in mind, we find no abuse of discretion. Wife's earning capacity was thoroughly reviewed. It was established by three years of employment during the early years of marriage and by nearly three years of employment following the separation. She earned a customary salary, and her pursuit of a bachelor's degree indicated a willingness to earn maximum income. She cannot be penalized for having remained in the home for twelve years; the nurturing of young children may supersede the economic benefits of full-time employment. *Hesidenz, supra; Butler v. Butler*, 339 Pa.Super. 312, 488 A.2d 1141 (1985).

These same factors apply to a review of that portion of the order addressing alimony pendente lite. Earning capacity is relevant whether the proceedings concern child support or alimony pendente lite. *Pacella v. Pacella,* 342 Pa.Super. 178, 492 A.2d 707 (1985).

Fourth, husband argues that the trial court erred in adding the value of certain business perquisites to his actual income. In 1983, husband earned $45,189.00 in net income from his medical practice. The trial court added $15,000.00 to his net income because of the following perquisites provided by Associated Internists, Inc. on behalf of both shareholders: 1) contributions of $37,749.00 to a defined benefit pension plan; 2) $2,347.00 in prepaid rent; 3) $3,726.00 for automobile expenses; 4) $4,329.00 for travel and entertainment; 5) $5,903.00 for telephone expenses; 6) $4,032.00 for dues and subscriptions; and 7) $15,920.54 for premiums on health, disability, life, malpractice, liability, fire and accident insurance.

Husband maintains that only those perquisites which raised his standard of living can be attributed to income. He argues that all of these expenses either benefited the corporation solely or did not raise his standard of living.

When actual earnings do not reflect earning capacity, the trial court is free to investigate a variety of sources to determine a party's true wealth. In *Pacella v. Pacella, supra,* 342 Pa.Super. at 187, 492 A.2d at 712, we illustrated some factors in addition to actual earnings which determine income:

> *See e.g., Commonwealth ex rel. Maier v. Maier,* 274 Pa.Super. 580, 418 A.2d 558 (1980) (where supporting spouse is sole stockholder of corporation and determines his own salary, court may pierce corporate veil and use corporate income as basis for determining earning capacity); *Commonwealth v. Miller,* 202 Pa.Super. 573, 198 A.2d 373 (1964) (where supporting spouse is self-employed, net income, as it appears on income tax forms, is not "infallible" measure of real wealth; court accordingly may add back portion of depreciation deduction in calcu-

lating amount of support owed); *Commonwealth ex rel. Gutzeit v. Gutzeit,* 200 Pa.Super. 401, 189 A.2d 324 (1963) (in determining supporting spouse's earning capacity, court should consider not only salary paid by wholly owned corporation, but all prerequisites [sic] provided by corporation.)

In *McCurry v. McCurry,* 279 Pa.Super. 223, 420 A.2d 1113 (1980), we remanded for a hearing to determine the nature of husband's business ventures and assets. We directed the trial court "to consider to what extent [husband's] ability to pay support may be enhanced by corporate perquisites...." *Id.,* 279 Pa.Superior Ct. at 232, 420 A.2d at 1118. Similarly, in *Commonwealth ex rel. Swank v. Swank,* 266 Pa.Super. 94, 403 A.2d 109 (1979), and *Commonwealth ex rel. Gitman v. Gitman,* 428 Pa. 387, 237 A.2d 181 (1967), it was held that perquisites derived from part ownership in corporations shall be considered income.

■■ Husband agrees that perquisites affect ability to pay; however, he maintains that the corporate expenses here were not perquisites which enhanced his income. The benefits were allegedly enjoyed by the corporation alone.

We have reviewed the testimony of Leon Butler, a certified public accountant who was employed by wife to value Associated Internists, Inc. Butler testified that several corporate deductions were added to the value of the corporation because they were solely for husband's benefit. Therefore, according to Butler, husband enjoyed the following perquisites which did not directly benefit the corporation: 1) 50% of expenses for maintaining two corporate-owned automobiles; 2) 50% of payments for loans on those automobiles; 3) certain travel and entertainment expenses; 4) dues to a social organization; 5) insurance premiums for a life insurance policy which funded a buy/sell agreement; 6) contributions to the corporate pension plan; and 7) certain dining expenses.

The master's findings and Butler's testimony indicate that several corporate expenses reduced corporate profits and husband's take-home income. Three employees partici-

pated in the defined benefit pension plan, and husband's one-third share of 1983 corporate contributions was $12,650.00. Husband and his partner, Dr. Lampe, each operated a corporate automobile. The evidence indicated that husband did not use his vehicle for house calls or other medical business; he used it primarily to drive to his place of employment and for personal reasons. Husband's one-half share of the automobile expenses was $1,242.00. Husband's one-half share of corporate expenses for dues and subscriptions was $2,016.00, and his one-half share of insurance premiums was $7,960.27.

It is not clear what portion of travel and entertainment expenses of $4,329.00 and telephone expenses of $5,903.00 were attributable to husband's personal use. Nevertheless, there was testimony that husband did indeed charge some personal travel, entertainment and telephone expenses to the corporation. Also, wife testified that household expenses for drugs, laundry, dry cleaning and books were charged to the corporation.

Irrespective of the travel, entertainment, telephone and household expenses, husband's share of the aforementioned identifiable expenses for 1983 was $23,868.27. Considering husband's reported income and tax bracket for 1983, assigning another $15,000.00 of net income to his net income of $45,189.00 was not an abuse of discretion. Therefore, we find no error in raising husband's 1983 net income by $15,000.00 in perquisites.

Husband's fifth attack on the support and alimony pendente lite order concerns his obligation to pay the mortgage and household expenses. Husband alleges that burdening him with these expenses was inequitable, because wife had moved from the premises, and the master had awarded the house to her.

Wife moved from the marital residence in October, 1982; husband lived there until October, 1984. Wife's right to receive the benefit of husband maintaining the marital residence was not affected by her moving. Alimony pendente lite continues pending resolution of all economic

issues. *Desch v. Desch,* 329 Pa.Super. 22, 477 A.2d 883 (1984); *Wolk v. Wolk,* 318 Pa.Super. 311, 464 A.2d 1359 (1983). Wife was not financially able to maintain the marital residence while she supported two children and defrayed rental and utility expenses on her new residence. Wife needed husband's support to preserve the marital residence pending its equitable distribution.

In *Gee v. Gee,* 314 Pa.Super. 31, 460 A.2d 358 (1983), the wife was entitled to one-half of the fair market rental value of the marital residence while the husband resided there alone. The wife's absence from the home did not affect her right to rental compensation. Similarly, wife's absence from the marital residence here should not affect her right to husband's maintenance of the house until equitable distribution.

Husband overlooks the fact that he resided in the home for two years following wife's departure. Therefore, his payment of the mortgage, taxes and insurance was not entirely for wife's benefit; he enjoyed the house for two years as he had shelter and preserved a valuable asset for equitable distribution.

Husband's contention that the trial court erred in ordering him to maintain the home after the master had awarded it to wife is equally meritless. Husband had filed exceptions from the master's recommendation which prevented an order awarding the house to wife. As long as husband's exceptions were pending, neither party had sole control over the residence. Therefore, it was appropriate and equitable for husband, earning a higher income, to maintain the residence.

Husband's final argument concerning alimony pendente lite involves the order of March 4, 1986. This order was entered after husband had appealed from the child support and alimony pendente lite order and from the equitable distribution order. The March 4, 1986 order responded to husband's petition to reduce or terminate alimony pendente lite. Husband alleges that alimony pendente

lite should have been reduced or terminated because wife had been awarded $10,000.00 in attorney fees and had remarried on October 12, 1985.

■■■ An award of alimony pendente lite is designed to enable the dependent spouse to prosecute or to defend a divorce action. *Orr v. Orr*, 315 Pa.Super. 168, 461 A.2d 850 (1983). It is also designed to help the dependent spouse maintain the standard of living enjoyed while living with the independent spouse. *McNulty v. McNulty*, 347 Pa.Super. 363, 500 A.2d 876 (1985). Therefore, a dependent spouse may be entitled to alimony pendente lite and counsel fees because both are necessary to maintain the divorce proceeding and a certain standard of living. This is particularly true when the dependent spouse is employed and attempting to complete an education.

Even with awards for counsel fees and alimony pendente lite, wife did not reach the standard of living that she had enjoyed with husband. She purchased a modest home with financial assistance from her parents and grandmother. Her absence from the nursing workforce for twelve years limited her employment opportunities and forced her to accept entry level positions. She could no longer enjoy a large residence with a custom-designed interior, frequent entertainment and an extensive wardrobe.

■■■ Wife's remarriage similarly did not affect the alimony pendente lite award. This identical issue was addressed in *Miller v. Miller*, 352 Pa.Super. 432, 508 A.2d 550 (1986). Section 507 of the Divorce Code, 23 P.S. § 101 et seq., provides that cohabitation precludes "any award of alimony...." We held in *Miller* that § 507 refers only to alimony; cohabitation or remarriage does not bar an award of alimony pendente lite. Contrary to husband's suggestion, then, "*any* award" does not include alimony pendente lite.[2]

2. Husband also maintains that the award of spousal support and alimony pendente lite was confiscatory because it exceeded one-third of his income. As discussed earlier, husband's income included perquisites which added $15,000.00 of annual net income. When

## Equitable Distribution

██ Husband raises one argument concerning the trial court's distribution of marital property. He claims that the trial court erred by including good will of $47,666.00 in the value of his medical practice.[3]

We note that husband does not challenge the valuation of good will; he argues that good will should not be considered marital property regardless of its worth. Therefore, this is not a valuation question.

Husband supports his contention with several theories: 1) good will is essentially reputation, and he has no reputation in the community as most of his patients are referred by other physicians; 2) good will is earning capacity, not marital property; 3) if good will were marital property, wife would be awarded a double recovery as it would then be a factor in determining alimony and equitable distribution; and 4) the buy/sell agreement which husband executed with his partner did not value good will.

Wife's experts testified that good will can be valued as property and distributed equitably. Wife cites several opinions from other jurisdictions where good will of a professional practice was held to be marital property. *See Hurley v. Hurley*, 94 N.M. 641, 615 P.2d 256 (1980); *In Re Marriage of White*, 98 Ill.App.3d 380, 424 N.E.2d 421 (1981). She also argues that the buy/sell agreement was not admissible evidence because the absence of the original precluded admission into evidence of a copy.

Although Pennsylvania courts have not addressed whether the good will of a medical practice is marital property, we have recently decided that the good will of a law practice, operated as a sole proprietorship, is not marital property.

considering husband's actual income and the value of his perquisites, the support and alimony pendente lite award does not exceed one-third of his income.

**3.** Husband actually argues that good will was valued at $70,245.00. That figure was husband's one-half share of the entire medical practice; $47,666.00 is the good will portion of husband's interest.

*See Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545 (1986).

In *Beasley,* the husband was an individual practitioner. He employed fifteen attorneys, and earned a substantial annual income. The husband and his associates were trial attorneys, and their compensation was determined by contingent fees.

Several factors led us to hold in *Beasley* that good will of a law practice, operated as a sole proprietorship, was not marital property. First, the value of a sole proprietor's good will is placed on his person, whereas the value of good will in a partnership, professional corporation or general corporation is placed on the firm. Good will does not survive the death of a sole proprietor, but the good will of a partnership or corporation survives its owners. Second, the value of an ownership interest in a corporation or partnership is measured by contract or the market, whereas the work effort of a sole proprietor determines the value of his interest. Third, while owners of a partnership or corporation have share arrangements, the sole proprietor has only his professional reputation.

In addition to the aforementioned distinctions between sole proprietorships and other business entities, we stated in *Beasley* that good will of a sole proprietor relates only to future earnings; it is an expectancy only, with no present value and no guarantee of future income. As it related to future earnings only, it was a factor in determining the amount and duration of alimony. If good will diminished, thereby reducing income, alimony could be modified to ease the payor's burden. If, however, good will were also marital property to be paid in installments, declining good will would reduce income but would not affect the payments. An equitable distribution order is nonmodifiable. In *Beasley,* we refused to allow good will to cause a double charge on future earnings, which would occur if it were both marital property distributed by installments and income for determining alimony.

Finally, the *Beasley* court noted the contingent fee arrangement that the lawyer husband and his associates had with clients. Contingent fees are collected when a settlement is reached or when the litigant collects on a judgment. Before collection, no value can be assigned to the attorney's work as payment of the fee is uncertain.

In addition to the opinions and articles concerning good will discussed in *Beasley*, several other cases from foreign jurisdictions are deserving of comment. In *Dugan v. Dugan*, 92 N.J. 423, 457 A.2d 1 (1983), the New Jersey Supreme Court held that an attorney's good will in an. exclusively owned professional corporation was marital property. Although the business entity in *Dugan* was a professional corporation, the New Jersey court implied that good will in a sole proprietorship may constitute marital property. In finding good will present in a partnership, corporation, joint venture or individual proprietorship, the *Dugan* court seemed less concerned with the form of the business entity and more concerned with the probability of future earnings. If future earnings were probable, there was good will with present value capable of equitable distribution.

The *Dugan* court was not troubled by the fact that an individual practitioner is generally unable to sell a law practice. Once an attorney retires or dies, only his tangible business assets remain for sale. Although good will or personal reputation cannot be sold by an attorney, the *Dugan* court held that that "does not eliminate existence of goodwill and its value as an asset to be considered in equitable distribution." *Id.* at 434, 457 A.2d at 6.

In *Beasley*, we did not agree with *Dugan's* approach. We found it significant that once a sole proprietor terminates his practice, nothing is transferable except tangible personal property. Clients could not be sold as they had the unconditional right to choose an unaffiliated attorney for future representation. We concluded that the nontransferable nature of a law practice diminishes the value of good will.

In *Levy v. Levy,* 164 N.J.Super. 542, 397 A.2d 374 (1978), the New Jersey court held that the good will generated by an attorney who operated a professional association was marital property capable of being valued. In fact, the *Levy* court quickly identified the good will as marital property and discussed in detail the method of valuing good will.

New York was confronted with a factual situation similar to the matter sub judice in *Nehorayoff v. Nehorayoff,* 108 Misc.2d 311, 437 N.Y.S.2d 584 (1981). Nehorayoff and another physician were the owners of a closely held professional corporation which provided medical services for the termination of pregnancies. In holding Nehorayoff's share of good will to be marital property, the New York court noted that the physicians operated a clinic which attracted patients by advertisement, reputation or referral. The reputation was generated by the clinic and not by the physicians because there was no personal relationship between doctor and patient. The court also found that there would be no appreciable decline in business if Nehorayoff or his colleague left the clinic. Finally, it was noted that Nehorayoff's skills were not unique; they were shared by many other physicians in the area. The *Nehorayoff* court focused on the nature of the business at issue and not on whether it was a sole proprietorship, partnership or corporation.

In *Geesbreght v. Geesbreght,* 570 S.W.2d 427 (Tex.Civ. App., 1978), the husband was a physician who shared equal ownership with another physician in a professional corporation which provided emergency room service for several hospitals. The firm contracted with hospitals to treat emergency room patients, but it did not have patients of its own. The *Geesbreght* court first stated that had the husband's medical practice been a sole proprietorship, good will would have no value for purposes of partition. However, it was a professional corporation having good will capable of being valued and divided. Had the husband sold his stock to another physician and left the firm, the firm would have retained the service contracts with the hospitals. There were no patients for the husband to take with him.

The *Geesbreght* court commented on the difference in good will of a sole proprietorship and of a professional corporation.

> "Good will" is sometimes difficult to define. In a personal service enterprise such as that of a professional person or firm, there is a difference in what it means as applied to "John Doe" and as applied to "The Doe Corporation" or "The Doe Company." If "John Doe" builds up a reputation for service there may be a change in personnel performing the service upon a sale of its business, but the sale of such business naturally involves the right to continue in business as "The Doe Company." The "good will" built up by the company would continue for a time and would last while the new management performing the same personal services, would at least have the opportunity to justify confidence in such management while it attempted to retain the "good will" of customer clients of the former operator.
>
> At least the opportunity to have time to try to preserve the "good will" already existent and to use it as an entrance into the identical field of operations in a personal service type of business would be present where the name of the business is a company name as distinguished from the name of an individual. Therein does it have value, plus the value of the opportunity to justify confidence in the new management by the customer/clients of the predecessor owners.

570 S.W.2d at 435–36.

*Beasley* and the aforementioned opinions discussed the distinction between professional practices operated as sole proprietorships and as corporations. They considered the distinction to be critical in deciding whether good will was marital property. Although all agree that the form of the practice is critical, only *Geesbreght* held it to be conclusive. Presumably, special circumstances may justify holding that the good will of a professional sole proprietorship is marital property while the good will of a professional corporation is not. In *Beasley,* we discussed at length the importance of

contingent fees in determining whether good will has present value. If the outcome had depended exclusively on the form of the professional practice, we would have disregarded the contingent fees factor and held simply that good will is not marital property because the husband practiced law as a sole proprietor. In fact, we implied in *Beasley* that the form of the law practice was not dispositive: "We, therefore, hold that good will of a sole proprietorship *under these facts* is not an element of present value [which can be considered marital property]." *Id.* 359 Pa.Super. at 42, 518 A.2d at 556 (emphasis added).

Our factual analysis compels us to hold that good will has no present value for equitable distribution purposes in this case. Accordingly, the trial court erred by including good will in the value of husband's share of the professional practice.

Husband practices medicine with Dr. Lampe, and they are each 50% shareholders of Associated Internists, Inc. No other physicians are associated with the firm. Husband and Lampe are board certified in internal medicine. After becoming a board certified internist in 1972, husband earned a rheumatology fellowship in 1973. Eighty-five percent of husband's patients are treated for rheumatism, and 70% of his rheumatology patients are derived from physician referrals. Husband is the only rheumatologist in the area of York, Pennsylvania. Since Dr. Lampe does not practice rheumatology, the physicians infrequently treat each other's patients.

With the exception of an informal arrangement with nursing homes which produces only a few patients, husband and Dr. Lampe do not have contracts to provide services for any hospital or medical group. Their patients are privately acquired.

We believe that if husband left the professional corporation, at least his rheumatology patients would follow. It was husband, not the professional corporation, who attracted the rheumatology patients. Therefore, upon his' death,

retirement or resignation, there would be no other physician at the corporation who could retain husband's patients.

Due to husband's specialty, his minimal sharing of patients with Dr. Lampe, the physician referrals and the absence of competition from other rheumatologists, we hold that husband's practice is similar to that of a sole practitioner. It is similar to the individual proprietor in *Beasley* and requires the same treatment: the good will of husband's practice has no present value, is not marital property and cannot be equitably divided.

We recognize that husband performed medical treatment for standard fees unlike the husband in *Beasley* who was compensated by contingent fee. We further note that *Beasley* explained that present value of work in progress can be determined when fees are standard and fixed, whereas contingent fees prevent a reliable valuation of pending work. Nevertheless, this factual distinction is not sufficient to overcome the common element that husband here and the husband in *Beasley* were the essence of any good will in their business interests.

### WIFE'S APPEAL

#### Equitable Distribution

Wife raises four arguments in her appeal, three of which take issue with the equitable distribution of marital property. First, wife argues that the trial court erred in ruling that $19,800.00, which was placed in trust for the parties' sons, was not marital property.

In June, 1982, before the parties separated, their older son, Vincent, was seriously injured in an automobile accident. Since Vincent's medical and hospital expenses were covered by separate health and automobile insurance policies, husband and wife received $19,800.00 from one policy which was the amount paid to providers of medical treatment under the other policy.

On October 18, 1982, husband placed $10,000.00 of these insurance proceeds in a certificate of deposit in trust for son

Vincent. On September 24, 1982, another $3,000.00 from the same source was placed in a similar account for Vincent. On October 18, 1982, $5,000.00 of the insurance proceeds were placed in a trust account for son John. These three accounts were titled in husband's name and created under the Uniform Gifts to Minors Act. 20 Pa.C.S. § 5301 et seq. All three trusts were created after separation. The balance of $1,500.00 was used for unrelated expenses.

Wife alleges that husband acquired the certificates without her knowledge. She claims that they had planned to use the money for travel or to redecorate the house, and that husband unilaterally changed those plans by placing the funds in trust for the children. According to wife, husband did so to place these funds beyond her control and outside the realm of marital property.

In *Hurley v. Hurley,* 342 Pa.Super. 156, 492 A.2d 439 (1985), the wife sued a third party for personal injuries sustained prior to separation, but the verdict was entered and payment received after separation. The *Hurley* court first noted § 401(f) of the Divorce Code which states that all property "acquired by either party during the marriage is presumed to be marital property regardless" of the form of title, whether it be individual, joint or by tenancy in common or by the entirety. The court then noted the exceptions enumerated in § 401(e) to this general rule. Of these exceptions, the court focused on § 401(e)(4) which provides that "[property] acquired after separation until the date of divorce ..." is not marital property.

Following these references to the Divorce Code, the *Hurley* court held that a tort cause of action is unliquidated until either verdict or settlement. While unliquidated, a tort claim is not a property right nor is it assignable. To distribute a tort claim while it remains unliquidated requires speculation and conjecture. Accordingly, the *Hurley* court held that because the tort claim became liquidated after separation it was property *acquired* after separation. Under § 401(e)(4), then, it was not marital property.

■ Here, wife acknowledges that the insurance proceeds were not paid until after separation. She argues, however, that *Hurley* is not applicable because it was limited to tort causes of action. She maintains that the proceeds here were paid under a contract of insurance that she and husband had with the carrier.

The nature of the wife's accident in *Hurley* is not stated in the opinion. Since her claim proceeded to a jury trial, and a verdict was returned for pain, suffering and disfigurement, it may be presumed that payment on the verdict was made by a third person with whom the wife did not contract. Evidently, the wife in *Hurley* did not have the opportunity to submit her claim to her insurance carrier.

Regardless of who was liable for Vincent's injuries, payment to his parents for the amount of his medical expenses was guaranteed. This guarantee was due to identical coverage provided by the parties' automobile and medical insurance carriers. One carrier paid the provider of the medical services; the other paid the parties for those same services. The amount received did not compensate Vincent for pain, suffering or disability as was done at least in part in *Hurley*. Furthermore, the amount of the claim was ascertainable as the $19,800.00 represented medical services rendered before separation. Therefore, there was nothing conjectural, speculative or nebulous about the validity and amount of Vincent's claim.

We agree with wife's position that *Hurley* is not applicable. Title to the insurance proceeds was acquired prior to separation. Vincent's medical treatment, which was rendered prior to separation, guaranteed that one carrier would pay the parties for the value of that treatment.[4]

4. Our holding does not extend to medical treatment administered after separation. The need for and amount of medical treatment after separation would be unknown; therefore, the amount collected for such treatment may not be marital property. This may be so even though the parties know before separation that double coverage assures payment to them of the value of medical treatment if administered.

The fact that *Hurley* is inapposite, however, does not dispose of whether the amount collected for Vincent's injuries is marital property. Two more inquiries remain: 1) whether the insurance proceeds were property acquired by the parties; and 2) if so, whether they were "disposed of in good faith and for value prior to the time" divorce proceedings were commenced. *See* 23 P.S. § 401(e)(5).

■ We hold that title to the insurance proceeds passed to the parties despite the fact they were paid for Vincent's injuries. Husband and wife were the owners of the insurance policies and were obligated to pay the premiums. Vincent was merely a subject of coverage. The details of the trusts are not in the record; nevertheless, it is clear that husband maintains title to the trusts and exclusive right to control the funds until Vincent and John reach majority. Therefore, the presumption of § 401(f) is met: the insurance proceeds are marital property because they were acquired by the parties during marriage.[5]

■ Finally, the exception provided by § 401(e)(5) is inapplicable. Husband may have disposed of the insurance proceeds in good faith by establishing trusts for his sons; however, the trusts were not established in exchange for value. Section 401(e)(5) requires a disposition that brings some value, yet husband disposed of the proceeds as gifts.

Wife's second attack on equitable distribution concerns the valuation of husband's pension benefits. The trial court ruled that the value of husband's share of the corporation's defined benefit plan was $26,960.00; wife maintains that the value was $51,236.00.

Husband called George Taylor, a consulting actuary, to testify concerning the value of husband's interest in the pension plan. Taylor was enrolled as a member of the Society of Pension Actuaries, and was certified to perform

5. An equitable distribution of the insurance proceeds to husband and wife in this context does not necessarily mean that they have the unconditional right to dispose of the assets. Laws protecting minors may limit the parties' use, enjoyment and disposition of these proceeds.

actuarial services under the Employee Retirement Income Security Act (ERISA). Taylor's employer administered the retirement program for husband's professional corporation.

Taylor computed the value of husband's benefit to be $26,960.00 as of September 1, 1982, a few days prior to separation. This value was calculated by applying 5½% interest and 1965 mortality tables to the accrued retirement benefit payable at age sixty-five. Taylor testified that the interest rate of 5½% and the mortality tables were applied to discount the retirement benefit in order to reach a present value.

Wife's expert, Harry Leister, was also a fully qualified actuary. He testified that the asset value of the plan as of June 1, 1982, was $197,962.78 and that husband's share was $51,236.00. Leister then testified that had the plan terminated on June 1, 1982, the total assets would have been disbursed and husband would have received $51,236.00. That is the amount wife believes is marital property.

The retirement plan created for Associated Internists, Inc. was a defined benefit plan. Husband's expert explained that a defined benefit plan provides the employee with a fixed amount per month at retirement for life. In that regard, it is an annuity, and is unlike a defined contribution plan which does not guarantee a specific monthly payment upon retirement. A defined contribution plan may be a profit-sharing plan or stock bonus plan where the employer makes the contributions and the interest earned fluctuates with market conditions.

■ Valuation is affected by the method of distribution. In *Braderman v. Braderman*, 339 Pa.Super. 185, 488 A.2d 613 (1985), we adopted two methods of distributing retirement benefits: 1) immediate offset method; and 2) deferred distribution method. The immediate offset method is properly used when the present value of the benefit is sufficient to make a present distribution. Conversely, a deferred distribution does not employ present value because many variables make it too difficult to determine. Instead, the court retains jurisdiction and allocates benefits when they

mature or are paid. Deferred distribution is also the preferred method when the parties' other assets are insufficient to offset a pension award.

Here, the immediate offset method is more appropriate because present value can be ascertained, and the parties have sufficient assets to coordinate with a pension award. It is also the preferred method as both parties are prepared to value the pension benefits and to make one lump-sum distribution.

■■■ Present value of husband's interest in the defined benefit plan as of September 1, 1982, is the amount available for equitable distribution. The *Braderman* court adopted a formula for calculating present value. *See* Troyan, *Pension Evaluation and Equitable Distribution*, 10 Fam.L.Rep. 3001 (1983). Present value is to be calculated as follows:

1. Calculate the amount of husband's monthly pension benefit, assuming he was at age sixty-five on September 10, 1982, the date of separation.

2. Find husband's life expectancy at the time of separation and subtract his normal retirement age to determine the expected number of months of pension benefits.

3. Select an appropriate discount rate.

4. Find the value of the annuity at age 65.

5. Discount the value at age 65 to present value accounting for mortality, disability and termination.

6. Reduce present value of the plan if it has not yet vested.

7. Apply the coverture fraction if a portion of the pension was earned before marriage.

Step number six is not applicable as husband is fully vested. Similarly, step number seven does not apply because the parties were married five years before the pension plan was created in 1972; their marriage spanned the life of the plan to the date of separation.

Returning to the expert testimony of record, we hold that husband's expert, George Taylor, properly applied the formula in calculating present value. He explained that

> ... the accrued benefit is a benefit which is payable at age 65 or at retirement and to find its present value, you must take the value of that benefit at retirement and apply appropriate discount factors.

N.T., February 23, 1984, at 152. Taylor then testified that he applied a discount factor of 5½% interest, which is a rate expected over the life of the plan, and 1965 mortality tables. This testimony indicates that Taylor covered steps one through five in arriving at a present value of $26,960.00.

Wife values husband's pension interest on date of separation by dividing the total assets in the plan, $197,262.78, by three, the number of participants. The result of $51,236.00 is unrealistic and inequitable. As husband's expert explained, husband may receive retirement benefits only if he were

> eligible for retirement or [he terminates] employment or [he] were to pass away. This is a requirement of law in order to have a plan approved by the Internal Revenue Service....

N.T., February 23, 1984, at 149. If husband had died or terminated his interest in the plan on the date of retirement, he would have received only $26,960.00.

The total value of all assets in a defined benefit plan and the employee's proportionate share thereof, do not determine value. Valuation must consider discount rates, mortality and tax penalty laws. Wife's approach to valuation may be more appropriate in a defined contribution plan where an account is assigned to an employee and is composed of the employer's contributions, plus earnings.

Wife's final argument concerning equitable distribution is that the trial court erred in ruling that it had no jurisdiction to distribute three certificates of deposit held in her name and her children's. These three certificates were separate and apart from those established with the insur-

ance proceeds. They represented funds accumulated over the years. Wife does not want these funds equitably divided between the parties; however, she wants to regain possession of the certificates from husband.

Husband and wife agree that these certificates were established by periodic deposits of savings, titled in wife's name and held for the children's benefit. The evidence is further incontrovertible that husband possesses the certificates.

We agree that wife should be given possession and control of the three certificates, but only for the benefit of the children. Section 401(c) of the Divorce Code provides:

> In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this act, and may grant such other relief or remedy as equity and justice require against either party or against any third person over whom the court has jurisdiction and who is involved in or concerned with the disposition of the cause.

It is apparent that the parties made gifts of these certificates to their children and that they agreed that wife should control the funds. With the authority provided by § 401(c), we order husband to release possession of these certificates to wife for the sole benefit of the children.

### Alimony

Wife's final argument is that the award of alimony of $7,500.00 should continue despite her remarriage on October 12, 1985. This argument is not properly before us. Wife raises this argument as a precaution in the event we rule that her remarriage terminated her right to alimony pendente lite. The trial court ruled only on the issue of whether or not wife's remarriage terminated alimony pendente lite; it did not consider the effect remarriage had on alimony. Moreover, no petition to terminate alimony was

presented. Without an order terminating alimony, there is nothing to review.

## CONCLUSION

Order of July 9, 1985, is affirmed. Order of March 4, 1986, is affirmed.

Order of September 5, 1985, and judgment of September 5, 1985, are affirmed in part and reversed in part. The order and judgment are reversed to the following extent:

1. Rocco J. DeMasi's share of good will in Associated Internists, Inc. is not marital property;
2. One certificate of deposit established October 18, 1982, in the amount of $10,000.00, in the name of Rocco J. DeMasi in trust for Vincent M. DeMasi, is marital property;
3. One certificate of deposit established October 18, 1982, in the amount of $5,000.00, in the name of Rocco J. DeMasi in trust for John M. DeMasi, is marital property;
4. One certificate of deposit established September 24, 1982, in the amount of $3,000.00, in the name of Rocco J. DeMasi in trust for Vincent M. DeMasi, is marital property;
5. Three certificates of deposit shall be released to wife to be possessed, managed and controlled by her solely for the benefit of her children. These certificates are identified as follows:

   a. one established January 14, 1982, in the amount of $3,000.00, in the names of Tanya J. DeMasi or John M. DeMasi;

   b. one established February 21, 1980, in the amount of $3,500.00, in the names of Tanya J. DeMasi or Vincent M. DeMasi;

   c. one established January 14, 1982, in the amount of $1,000.00, in the names of Tanya J. DeMasi or Vincent M. DeMasi.

We remand for equitable distribution of the three trust accounts of $10,000.00, $5,000.00 and $3,000.00 which were

established with insurance proceeds from Vincent's automobile accident. The trial court may or may not find that these trusts should be maintained for the children. We also remand for reconsideration of equitable distribution; our holding which excludes good will from marital property and includes the certificates of deposit as marital property may require modification of the distribution of all other assets. Finally, the trial court must reconsider on remand the wife's entitlement to alimony following the distribution of the marital property. *Braderman v. Braderman, supra,* 339 Pa.Super. at 202, 488 A.2d at 621.