663 A.2d 148

**Carol BUTLER, Appellee,**

v.

**Leon BUTLER, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 6, 1994.

Decided July 24, 1995.

Kenneth J. Sparler, Andrew B. Brown, York, for L.I. Butler.

Rebecca N. Tortorici, York, for C.E. Butler.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and CASTILLE, JJ.

## OPINION

CAPPY, Justice.

■ This appeal involves the issue of valuation, for purposes of equitable distribution, of a spouse's business interest in an accounting firm. For the reasons that follow, we reverse, in part, the decision of the Superior Court, but affirm its order vacating the trial court's order of equitable distribution and remanding the matter to the trial court.[1]

A review of the relevant facts and procedural history reveals the following. Carol Butler and Leon Butler were married on May 10, 1964. During the initial few years of their marriage, Mrs. Butler was employed as a school teacher. However, beginning in or about 1967, she remained at home to care for the parties' three children. She re-entered the work force in 1979 as a retail sales clerk and later owned, although only for a brief time, a gift shop. Husband is a certified public accountant and has been employed as an accountant since the

1. We note that our disposition of the issues presented to this Court in no way impacts upon the issues on which the Superior Court based its vacation of the trial court's order as those specific issues were not appealed to us. We wish to emphasize, however, that our determination that the trial court erred in valuing husband's partnership interest, as is true with respect to the Superior Court's determination that the trial court erred with respect to other matters as more fully discussed *infra*, requires that the trial court's order of equitable distribution be vacated in its entirety due to the fact that these determinations will ultimately alter the economic positions of the parties and thus, upset the trial court's original scheme of distribution.

parties first married. He is currently a partner in the CPA firm of Einhorn, Butler, Gingerich & Co.[2]

The parties first separated in May, 1983, but then reconciled in May, 1984. They finally separated in December, 1984. Following the separation, Wife remained in the marital home with the parties' children. From the time of final separation until October, 1988, Husband maintained the marital residence insofar as he paid the mortgage, utilities, insurance, repair bills and other incidental costs associated with the maintenance thereof. He also paid child support. In addition Husband has paid, and apparently continues to pay, college tuition for two of the children. A final decree in divorce was entered on April 12, 1988. A master was then appointed to hear evidence and render a recommendation as to the economic issues relating to the divorce.

Pertinent to the issue of the value of Husband's business interest, the record evinces that beginning in October, 1984, and continuing to the present, Husband's employment was subject to a shareholder agreement. That agreement in essence provides that in the event a shareholder voluntarily decides to terminate his employment, loses his or her CPA license, or becomes permanently disabled, the shareholder must sell, and the Company must purchase, that shareholder's shares of stock at the agreed upon price of $10 per share or a total of $2450. The agreement further provides that upon the death of a shareholder, the Company is obligated to purchase and the shareholder's personal representative obligated to sell, the shareholder's stock for the sum of $100,000. In connection therewith, the agreement provides that the Company shall purchase a term life insurance policy on the life of each stockholder, the proceeds of which shall be used to satisfy this

2. At the time the parties separated in 1984, Husband was a 50% shareholder in the accounting firm. In the interim between separation and the date of the master's hearing, Husband's firm took on a third shareholder. Thus, at the time of the master's hearing, Husband's interest in the accounting firm was only 33%. The record presented to this Court indicates, however, that this third shareholder terminated her employment with Einhorn, Butler, Gingerich & Co. in or about 1989, thereby rendering Husband, again, a 50% shareholder.

$100,000 obligation. By its terms, the shareholder agreement is to terminate upon either the bankruptcy, receivership or dissolution of the Company; the death of all stockholders within a ninety day period of one another; or where there remains only one shareholder to this agreement.[3]

With respect to the issue of valuation of Husband's business interest, Wife presented the testimony of John A. Plesic, CPA. Mr. Plesic determined the value of Husband's accounting firm as of December 31, 1987, to be $546,889, which Mr. Plesic referred to as the "net equity value" of the partnership. He thus determined Husband's one-third interest therein to be $182,000. According to Mr. Plesic's testimony, this "net equity value" included an intangible value of $497,395 which he described as the going concern value and/or goodwill value which included a value attributable to the reputation and client base of the accounting firm as a whole.[4]

Husband testified as his own expert with respect to the valuation of Einhorn, Butler, Gingerich & Co. He testified

3. During this period of time, there were actually two distinct shareholder agreements; one entered into on October 31, 1984 between Husband and Michael R. Gingerich who were at that time the only two shareholders and the other one entered into July 7, 1986. The most recent agreement was necessitated by the addition of Brenda Hughes as a shareholder. The terms and provisions of both agreements, except of course with respect to the names of the shareholders, remained the same.

4. We would note that there is some confusion throughout the entire record with respect to the value actually assigned to the company by Mr. Plesic. The record reveals that while Mr. Plesic initially testified that the net equity value of the company was *$546,889*, he later testified that the value was really *$576,889*. In altering this valuation, Mr. Plesic explained that in his initial calculations he had incorrectly noted the cash on hand at $30,000 less than actually reported. Husband testified, however, that the correct figure for cash was, indeed, $24,047 and not $54,047. As noted *infra*, the Master initially employs the figure of *$576,889* in his Findings of Fact, but then in his recommendation, which was ultimately affirmed by both the trial court and the Superior Court, employs the figure *$546,889* in arriving at his final valuation figure of $141,148.16. Because we ultimately remand for a re-valuation of Husband's business interest this discrepancy in the record in no way alter's our resolution of this matter; we simply note it for the sake of clarity.

regarding five distinct methods of valuation concluding that the most appropriate method under the circumstances would be the fixed price method. According to Husband, this method would yield a value of $2450 which represents the amount fixed by the shareholder agreement.

The master's report and recommendation is somewhat cryptic. Initially the master acknowledged the Wife's expert's valuation as being $576,889. The master then notes that he would value this accounting firm at $497,395, which represents the intangible value assigned by Mr. Plesic, and Husband's interest therein as ⅓ of that figure or $165,798.33. The master also determined that the shareholders themselves valued the partnership with its client base at $300,000. In reaching this determination, the Master apparently relied upon the buy/sell provision contained in the shareholder agreement which relates to the death of a shareholder. In other words, since there were then three shareholders for whom life insurance policies of $100,000 each were in effect, the Master believed the shareholders themselves had assigned a value to the firm, including its client base, of $300,000. In his final analysis, however, the Master concluded that an average of this $300,000 figure and that assigned by Mr. Plesic would be "closest to the fact and most fair to both parties." Master's Report and Recommendation, p. 15. In so doing, however, the master employed the value of $546,889 rather than $576,889 as he had initially noted. Thus, he assigned a value of $423,444.50 to the entire firm and a value of $141,148.16 as representing Husband's one-third interest.

The trial court affirmed the master's recommendations. With respect to the issues pertinent to this appeal, the trial court found that value representing goodwill was properly includable for purposes of equitable distribution. Specifically, the trial court found that "husband's interest (⅓ of $497,395.00, or $165,798.33) is an asset of the business includable as marital property for equitable distribution purposes." In its order, however, the trial court adopted the value assigned by the

Master of $141,148.16 as representing Husband's one-third interest in the firm.

■ The Superior Court vacated the trial court order and remanded the case for further proceedings. With respect to the issue of valuation of Husband's business interest, the Superior Court concluded that the trial court erred in finding that the relevant date for purposes of determining Husband's *percentage share* of the business interest was that of the hearing rather than the date of final separation. According to the Superior Court, Husband's share of the firm should be valued at one-half, representing Husband's one-half interest as of the date of separation as opposed to one-third, which would represent his percentage share as of the date of the master's hearing. The Superior Court did, however, apparently agree with the value of the accounting firm as assigned by the Master and specifically agreed that goodwill was properly included therein. Accordingly, the Superior Court ordered that on remand, the equitable distribution scheme be based on Husband's fifty percent ownership of the accounting firm rather than a one-third interest.[5, 6]

■ In this appeal, Husband argues that the Superior Court erred in not valuing his business interest at $2450 as set forth in the shareholder agreement. In the alternative, Husband argues that even assuming the shareholder agreement does not control, the Superior Court erred in including the intangible value of goodwill in its valuation of his interest in

5. It should be noted that both the Superior Court and the trial court agreed that the *date* of valuation of the marital property, including Husband's business interest in the accounting firm, was the date of the master's hearing. Such a finding is in complete accordance with this Court's decision in *Sutliff v. Sutliff*, 518 Pa. 378, 543 A.2d 534 (1988). The Superior Court disagreed only as to the date on which Husband's *share* of the business interest should be identified.

6. Additionally, the Superior Court held that the trial court had erred in including the fair market rental value of the marital home in the marital estate rather than deducting Husband's share thereof from the Wife's ultimate distribution of marital property and that the trial court had also incorrectly calculated the total months that Wife resided in the marital residence. That issue was not, however, raised in this Court. Thus, on remand, the trial court is bound by that holding of the Superior Court.

the accounting firm.[7, 8]

▌ In support of his position that the shareholder agreement controls, Husband relies upon this Court's decision in *McCabe v. McCabe*, 525 Pa. 25, 575 A.2d 87 (1990). In *McCabe*, this Court held that for purposes of equitable distribution, the husband's partnership interest in a law firm was properly valued according to the method set forth in the governing partnership agreement relating to termination of a partnership interest rather than a "going concern" value since the facts presented there established that a value attributable to the going concern could not be realized by the husband.[9] In other words, because the husband himself could not, under the terms of the partnership agreement, realize a value attributable to the partnership as a continuing business such as his proportionate share of the accounts receivable or work-in-progress accounts should he wish to liquidate his share in the firm, this Court held that it would be inequitable to assign such a value for purposes of equitable distribution. In relevant part, we stated the following:

The partnership agreement contains provisions which clearly and narrowly define the rights of the partners.

7. Husband does not argue on appeal to this Court error in the Superior Court's holding with respect to the percentage of the total value of the firm which should be attributable to him.

8. The equitable distribution of marital property lies within the discretion of the trial court and, therefore, will not be disturbed on appeal unless we find an abuse of that discretion. *See, Bacchetta v. Bacchetta*, 498 Pa. 227, 445 A.2d 1194 (1982).

9. Whereas in the present matter, goodwill was included in the value assigned to Husband's business interest, goodwill was not included in the going concern value advanced by the wife's expert and accepted by the trial court in *McCabe. McCabe*, 525 Pa. at 28, 575 A.2d at 88. We would note that while goodwill and going-concern value are often referred to conjunctively as they are in the matter *sub judice*, the two are technically distinct. Going-concern value refers generally to the ability of a business to generate income without interruption, even where there has been a change in ownership, whereas goodwill represents a preexisting relationship arising from a continuous course of business which is expected to continue indefinitely. *See, e.g., Ithaca Industries, Inc. v. Commissioner of Internal Revenue*, 17 F.3d 684 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 83, 130 L.Ed.2d 35 (1994).

These provisions do not allow a partner to remove from the firm a proportionate share of the accounts receivable, work-in-progress accounts, or other accounts included in the "going-concern" value. Under no circumstances can a partner liquidate his share of the partnership and receive a proportionate share of the firm's total value, including its equipment, accounts receivable, etc. Rather, as discussed *supra*, a partner is strictly limited to receiving his capital account and his share of undistributed profits, in the event he wishes to liquidate his share in the firm. Nor does a partner have a right to retire from the firm and continue to receive a share of the firm's profits. Under these circumstances, it would be inequitable to apply a "going concern" value to the partner's share.

*Id.* at 29–30, 575 A.2d at 89.

Husband here argues that similar to the attorney in *McCabe*, because of the existence of the shareholder agreement, he too would be unable to realize any value attributable to the going concern or goodwill of the accounting firm should he leave that firm. Thus, he submits that the value assigned the shares of stock as set forth in the agreement, or $2450, should here control. In addition, Husband discounts the value attributable to his shares of stock upon his death, or $100,000, claiming that it is an improper value to be assigned to a present interest since he could never receive same in his lifetime.

Certainly, the shareholder agreement at issue in the instant matter, similarly to the agreement at issue in *McCabe*, by its terms precludes a shareholder who wishes to liquidate his or her share in the company from realizing a proportionate share of the company's total value, including its accounts receivable, equipment or other factors which would normally be included in the valuation of a business as a going concern. Accordingly, we agree that under the terms of the shareholder agreement in force here, Husband would be unable to ever realize a value based on the going concern. However, it does not necessarily follow therefrom, that the value as set forth in the

shareholder agreement should here control as it did in *McCabe*.

The agreement in *McCabe* is distinguishable from the one at issue here for reasons other than the issue of whether a going concern can be realized thereunder. Significantly, the *McCabe* agreement provides a formula of sorts for ascertaining a *current* monetary value, as opposed to a predetermined *fixed* value, since it provides for a share of the capital account and the undistributed profits. In other words, upon departure, a partner would realize monetary worth which bore some relation to the firm's current accounts. The agreement on which Husband here relies, however, provides only a fixed amount; one which the record clearly establishes was not periodically reviewed in an effort to determine whether it reflected the company's current financial picture.[10]

It is apparent that a value was assigned the stocks of this professional corporation in or about 1974 when Mr. Einhorn and Husband first incorporated. That precise value was then set forth in the shareholder agreement in 1984 and remains the value attributed to those shares today. Indeed, both Mr. Gingerich and Ms. Hughes purchased their respective shares of stock for this same value. The value of the shares of stock has thus remained constant over time and has never been re-evaluated to reflect the company's current financial picture. While the $2450 may indeed represent the value of the stock, it does not necessarily represent the present day monetary worth of the business.

Nor do we find that Husband's present interest in the accounting firm can be determined according to the value

10. In so noting, this Court does not intend to intimate in any manner, the validity or non-validity of such agreements, or more specifically, the buy/sell agreement, at issue here. We are not unmindful of the many purposes to be served by such agreements, nor do we wish to speculate on any of those purposes. Suffice it to say that it is our general belief, however, that such agreements are not entered into with equitable distribution in mind, but rather for purposes of effectuating the goals of the particular business. As will be discussed *infra*, the focus of the instant appeal is solely that of valuing Mr. Butler's business interest for purposes of equitable distribution.

assigned that interest in the event of his death. The agreement here provides that upon a shareholder's death, the company will purchase that shareholder's shares of stock for the sum of $100,000. However, the agreement also provides that the $100,000 will represent the proceeds from a life insurance policy purchased by the firm on behalf of each stockholder. As is true for the value assigned a shareholder's shares of stock upon voluntary withdrawal from the firm or upon disability, the $100,000 figure remained a fixed sum. As such, it is not an appropriate figure for valuing Husband's current interest in the accounting firm. Accordingly, we agree with both the trial court and the Superior Court that this particular shareholder agreement is not determinative of the value to be assigned Husband's interest in the accounting firm. Just what is indicative of that value is not, however, so readily definable.

Given the fact specific nature of such matters, there can be no single formula for valuing a business interest of a spouse for purposes of equitable distribution that will apply in all circumstances. However, we can set forth certain guiding principles. We find particularly helpful the New Jersey Supreme Court decision in *Stern v. Stern*, 66 N.J. 340, 331 A.2d 257 (1975). The issue in *Stern* involved the manner in which the interest of the husband in his law firm was valued. The court there found that generally the monetary worth of a law partnership will consist of the total value of the partners' capital accounts, accounts receivable, the value of work in progress, any appreciation in true value, together with good will, should there be any, with the total amount thereof being reduced by the amount of accounts payable as well as any other liabilities not reflected upon the partnership books. The court in *Stern* also noted, however, that the above factors will bear no meaning or relevance in ascertaining the present day monetary worth for purposes of equitable distribution unless it is also determined that the books of the firm are well kept and that the value of the partners' interests are periodically reviewed. In consideration of these factors, the court in *Stern* looked first to the terms of the existing partnership agree-

ment, concluding that the formula set forth therein for the calculation and payment of a partner's interest to a personal representative upon death, was most useful since that formula employed the sum of the above referenced general factors.[11]

■ Given these parameters, it becomes apparent that a buy/sell agreement will *not* always be beneficial for purposes of ascertaining a spouse's present interest in the business. The reason for this is clear: while certain buy/sell agreements such as the one at issue in *McCabe* will, indeed, be sufficiently comprehensive and provide a clear formula for purposes of valuing a spouse's business interest, others may not be so comprehensive or may not reflect the current situation. Where, however, such an agreement is in effect, it should be considered by the court in the first instance in an effort to determine whether a value which represents the present day monetary worth of the business interest can be ascertained from the provisions therein. If it is determined that the terms of the buy/sell agreement can be employed to ascertain a present day monetary value, any such value determined under those terms is only a presumptive value, which can then be attacked by either party as not reflective of the actual present

11. The precise discussion in *Stern* follows:

Of these, probably the most accurate and certainly most useful for present purposes is the formula for the calculation and payment of a partner's interest to his personal representative upon death. In such an event, according to the articles of partnership, his estate is to receive the then value of his capital account, readily determinable from the partnership books, together with a fixed sum appearing after the partner's name on a schedule appended to the partnership agreement. This schedule is revised quarterly. It is obviously intended to reflect those elements of partnership worth other than the member's capital account. The testimony reveals that these payments occasioned by death, are to be funded with the proceeds of life insurance on the lives of the several partners, the policies being owned by and the proceeds payable to the firm. The amount appearing after defendant's name on the schedule attached to the copy of the partnership agreement [which] was received in evidence was $167,500. We think the trial court would be justified in adding to this sum the value of defendant's capital account and treating the total as the [p]resumptive value of the defendant's partnership interest in the firm. We say [p]resumptive value only, because either plaintiff or defendant will be entirely at liberty to challenge the figure so determined as not being reflective of true value. *Stern,* 66 N.J. at 346, 331 A.2d at 260.

day value. Again, we caution that for purposes of valuing a spouse's business interest in the context of equitable distribution, an existing buy/sell agreement is to be viewed only as a factor or possible aid in valuing that interest and that we are in no way intimating the validity of any such agreement. It is simply one source to be considered for the purpose at hand, that being equitable distribution. Where the terms therein are not helpful for those purposes, such an agreement will simply serve no purpose in ascertaining the monetary worth of a spouse's business interest. In other words, a buy/sell agreement should be considered in the first instance simply because such agreements may, indeed, provide a formula of sorts which includes accounts receivable, capital accounts, accounts payable and so forth which, of course, apply numbers reflecting the current financial structure of the business. In sum, then, while buy/sell agreements may be a factor which aids the courts in ascertaining the present worth of a spouse's business interest, such are not necessarily determinative of that issue. The learned Superior Court in *Buckl v. Buckl*, 373 Pa.Super. 521, 542 A.2d 65 (1988), recognized these very principles, also citing *Stern*, clearly noting, however, that the precise method of valuation necessarily depends upon the particular facts and circumstances of each case.

Applying the foregoing principles to the instant matter, we agree with the Superior Court that the values assigned to the shares of stock pursuant to the shareholder agreement of this particular accounting firm are not controlling since the values stated therein do not reflect the current monetary worth of this firm. The circumstances in the instant matter are simply inapposite to those of *Stern*. Unlike in *Stern*, the value assigned the shares of stock in the instant matter was not revised periodically nor does it reflect the elements of the business's worth.

We thus turn to Husband's further contention that even assuming the shareholder agreement does not here control, the trial court erred in including goodwill in its ultimate valuation. For the following reasons, we agree with Husband.

■ As noted above, goodwill is not necessarily a factor in determining the monetary worth of a business. Rather, it must first be determined whether the particular business at issue enjoys "goodwill" such that a value therefore should be attributable to the actual business for purposes of equitable distribution. *See, e.g. Stern v. Stern,* 66 N.J. 340, 331 A.2d 257 (1975).

■ As this Court recently noted in *Solomon v. Solomon,* 531 Pa. 113, 611 A.2d 686 (1992), goodwill is essentially the positive reputation that a particular business enjoys. As the Superior Court in *Buckl* stated, it is "the favor which the management of a business has won from the public, and probability that old customers will continue their patronage." *Buckl,* 373 Pa.Super. at 530, 542 A.2d at 69. As such, goodwill is clearly property of an intangible nature.

■ As we held in *Solomon,* in determining whether goodwill should be valued for purposes of equitable distribution the courts must look to the precise nature of that goodwill. That goodwill value which is intrinsically tied to the attributes and/or skills of certain individuals is not subject to equitable distribution because the value thereof does not survive the disassociation of those individuals from the business. *Solomon,* 531 Pa. at 124–125, 611 A.2d at 692. In other words, where such goodwill is attributable solely to an individual's attributes it cannot be viewed as a value of the business as a whole. On the other hand, as this Court also noted in *Solomon,* goodwill which is wholly attributable to the business itself is subject to distribution. *Id.,* at 124–125, 611 A.2d at 692.

The Superior Court has addressed this precise issue as well employing a similar analysis. *See e.g., Buckl v. Buckl,* 373 Pa.Super. 521, 542 A.2d 65 (1988); *DeMasi v. DeMasi,* 366 Pa.Super. 19, 530 A.2d 871 (1987), *appeal denied* 517 Pa. 631, 539 A.2d 811 (1988); *Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545 (1986), *appeal denied* 516 Pa. 631, 533 A.2d 90 (1987); and *Fexa v. Fexa,* 396 Pa.Super. 481, 578 A.2d 1314 (1990). In *Fexa,* the Superior Court espoused the following:

If the nature of the economic good will is purely personal to the professional spouse, it is not *alienable;* hence, it cannot actually be realized and may not be included in the equitable distribution. If, however, a portion of the economic good will is attributable separately to the corporation or business and can be realized by sale to another (by selling the enterprise in whole or in part, buy-in's and buy-out's included), then *to that extent,* there is good will value subject to equitable distribution.

*Fexa,* 396 Pa.Super. at 487, 578 A.2d at 1317 (emphasis in the original) (citations omitted). The rationale behind this is clear: professional goodwill may be inextricably tied to the individual professional's ability to generate future earnings and because future income is not subject to equitable distribution, *Hodge v. Hodge,* 513 Pa. 264, 520 A.2d 15 (1986), goodwill of a personal nature should not be considered for purposes of equitable distribution. Moreover, where there has been an award of alimony, as in the case *sub judice,* to also attribute a value to goodwill that is wholly personal to the professional spouse, would in essence result in a double charge on future income. *See also, McCabe v. McCabe,* 525 Pa. at 30, 575 A.2d at 89.

Application of these principles to the facts presented in the instant matter leads us to conclude that the trial court erred in valuing for equitable distribution that goodwill which was wholly personal to Husband and thus inalienable. The evidence unequivocally established that Husband's clients are personal to him and that if he were to leave the partnership of Einhorn, Butler & Gingerich his clients would most likely follow him. The evidence presented here was that Husband had a particular client base comprised of the Greek community in that area who were loyal to him and not the firm and that if he were to leave this particular partnership, those clients would in all likelihood follow him. Even Wife's expert testified that if Husband were to leave the partnership tomorrow, aside from the terms of the partnership agreement, he would receive value in the amount of at least $182,000 which according to this expert would represent the client base that

Husband could take with him. And, while the evidence reveals that other employees of the accounting firm may be assigned to work on certain details or accounts involving clients particular to a specific shareholder, those clients remain the responsibility of the particular accountant who drew them to the firm. For example, Husband testified, as did Mr. Gingerich, that at times other employees of the firm may, at a shareholder's direction, service his or her clients but that those same clients would nevertheless remain the basic responsibility of a particular shareholder. On the other hand, Wife's expert testified that the accounting firm possessed a good reputation in the community, although evidence of such was not very specific. In short, the evidence here demonstrates that at least some of the intangible value attributed to Husband's interest in the accounting firm represented goodwill of a personal nature which, while capable of being realized for as long as Husband continues to practice as a CPA, is certainly not alienable and as such is incapable of presently being realized. Accordingly, it is clear that the inclusion of this professional goodwill in the total value of the accounting firm was in error.

In finding to the contrary, the Superior Court placed great emphasis upon the fact that a third shareholder, Brenda Hughes, had bought into the firm and was subsequently bought out and yet the firm still remained. Based upon this fact, the Superior Court found this case to be analogous to *Fexa v. Fexa*, 396 Pa.Super. 481, 578 A.2d 1314 (1990), wherein another panel of the Superior Court found that because there had been partners who had bought-in and were subsequently bought-out and yet the dental practice remained, there was goodwill not entirely personal to the individual professionals involved and, therefore, goodwill subject to equitable distribution. The facts in *Fexa* are, however, distinguishable. There, the Superior Court explicitly found that despite the fact that various partners had come into the practice and others had left, *"[t]he form of the business and its work continued unchanged." Id.* at 489, 578 A.2d at 1318. In the instant case, however, the same cannot be found. The

evidence here was that as a result of certain accountants and shareholders having left the firm, the firm lost some clients. Indeed, the record reveals a stipulation by the parties that at the time of leaving, Brenda Hughes was free to solicit clients of the firm and that she did, in fact, solicit some such clients who then transferred their business to her new employment.

Furthermore, the Superior Court's reliance upon the fact that Husband had acquired clients from his father upon his father's death in support of its holding that the firm of Einhorn, Butler, Gingerich & Co. thus possessed goodwill not wholly personal to the individual partners, is incorrect. First, at the time of Husband's father's death, the firm of Einhorn, Butler & Gingerich did not exist. Indeed, it was not until approximately 3 years after Husband's father had died that Max Einhorn and Husband even merged their practices. Thus, it cannot be said that any clients that Husband acquired as a result of his father resulted from any "loyalty to the firm" since, indeed, there was no such firm at that time.

Given the foregoing, we conclude that this matter must be remanded for a redetermination of the value of Husband's partnership interest consistent with this opinion. Accordingly, we reverse that portion of the Superior Court opinion which upheld the valuation of Husband's partnership interest in the accounting firm of Einhorn, Butler, Gingerich & Co., but affirm its order vacating the trial court's order of equitable distribution.

MONTEMURO, Senior Justice, who is sitting by designation, did not participate in the consideration or decision of this matter.

PAPADAKOS, J., did not participate in the decision of this matter.

FLAHERTY, J., files a dissenting opinion in which ZAPPALA, J., joins.

382

FLAHERTY, Justice, dissenting.

I believe the distinction drawn by the majority between this case and *McCabe v. McCabe,* 525 Pa. 25, 575 A.2d 87 (1990), is invalid. *McCabe* should control this case, for there is nothing here which was not present in *McCabe.*

*McCabe* stated that:

where an agreement imposes strict limits on the value that can be realized by a partner, the agreement places the continuing welfare of the partnership as a whole above the interests of any particular member of the firm. This results in a true diminution in the distinguishable value of any given partner's interest, and it would be a fiction to appraise such an interest as though the limitations were not in effect.

*Id.* at 30–31, 575 A.2d at 89–90 (footnote omitted). The failure to follow *McCabe* may be due to the concept that the nonprofessional spouse is entitled to an equitable share of the value of his spouse's firm. If that were true, I would be with the majority, but it is a serious misstatement of the law. The firm is not in privity with the nonmember spouse; he has no call upon the firm or its assets. Rather he has a right to an equitable portion of the value of his spouse's interest in the firm.

If the partnership agreement is legally binding, there is no reason whatever to disregard its consequences. Unless we have a public policy which prohibits professional adults from establishing an association on whatever terms they find fitting, or in the absence of fraud or some other legal defect in the partnership agreement, the agreement is legally binding on its signatories, as it is on Mr. Butler in this case. That being so, we cannot ignore the consequences of the contract.

In this case, precisely as in *McCabe,* the value of the professional spouse's interest in his firm is severely limited by his partnership agreement. That limitation should determine the value of his interest for purposes of equitable distribution, as it did in *McCabe.*

The majority's distinction of *McCabe* I believe to be misplaced. The majority opinion states that "the *McCabe* agree-

ment provides a formula of sorts for ascertaining a *current* monetary value, as opposed to a predetermined *fixed* value," whereas this one "provides only a fixed amount" which "was not periodically reviewed in an effort to determine whether it reflected the company's current financial picture." This, to me, is irrelevant.[†] The fundament of *McCabe* was that when the professional member's interest was limited by contract the nonmember spouse's interest could be no greater than that of the member. *McCabe* gave no consideration to how often the valuation was updated nor to how accurately it reflected a relationship to the current value of the firm. It merely recognized the validity of the contractual limitation on the value of the partner's interest and the principle that the limitation necessarily also limited the nonpartner spouse's interest, which could be no greater than the partner's interest. That is equally true here. It is unjust in this case to base a professional spouse's obligations on a theoretical value which is completely beyond his legal ability to realize, as it would have been in *McCabe*. What was true five years ago is equally true today.

I therefore respectfully dissent.

ZAPPALA, J., joins this dissenting opinion.

---

[†] The majority seems to be operating on the unspoken assumption that there is something fraudulent about the partnership agreement, though fraud is not an issue in this case. The mere possibility of fraud does not justify the law in treating with suspicion every decision made in the ordinary course of business and rejecting a commonplace agreement simply because it is not updated with sufficient frequency to satisfy the majority. The principle that fraud is never presumed is an ancient one, expressed in Cooke's English King's Bench Reports, 550, "Fraus est odiosa et non praesumenda."