**In re Charles L. THOMAS, and Lisa N. Thomas, Debtors.**

**Bankruptcy No. 98–14907SR.**

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

March 25, 1999.

John R. Crayton, Crayton & Belknap, Bensalem, PA, for Debtors.

Ina S. Weiner, Internal Revenue Service, Philadelphia, PA.

Frederick L. Reigle, Chapter 13 Trustee, Reading, PA.

Daniel K. Astin, Office Of U.S. Trustee, Philadelphia, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### INTRODUCTION

At issue in the present case is the value of a secured claim held by the Internal Revenue Service ("IRS") in the Debtors' stock in a closely held corporation. By using the income method of valuation, the IRS calculated the stock to be worth $56,000 and based on that figure asserts a secured claim in the amount of $55,521.90 in the Debtors' Chapter 13 bankruptcy proceeding. By contrast, the Debtors assert that the stock is worth about $10,000, which is the liquidation value of the corporation. The Debtors argue that it is inappropriate to value the stock at an amount greater than its liquidation value because any additional value is the product of Charles Thomas' personal services, which is not, according to them, an item of property susceptible to an IRS lien. For the reasons explained below, the Court is not persuaded by the Debtors' argument and will allow the IRS's claim to stand as filed.

### BACKGROUND

The Debtors, Charles and Lisa Thomas, filed for relief under Chapter 13 of the Bankruptcy Code on April 17, 1998. The IRS filed an amended proof of claim dated August 20, 1998, in the amount of $79,243.92, consisting of a secured portion of $55,521.90, an unsecured priority portion of $20,652.45 and a general unsecured portion of $3,069.57. The alleged collateral for the secured amount of the claim is Charles Thomas' ownership interest in stock for a wholly owned close corporation called All American Courier, Inc. The Thomas' appear to believe that their personal liability on the secured portion of the taxes is dischargeable.[1] On September 2, 1998, the Debtors filed an objection to the IRS's claim, arguing that the secured amount of the claim had to be reduced pursuant to 11 U.S.C. § 506(a) to the value of the collateral, which at the time the Debtors estimated to be about $3,000.

---

1. For purposes of this opinion the Court too assumes, without deciding, that the taxes are dischargeable.

A hearing on the objection was held on December 14, 1998, and testimony was received from Charles Thomas, William Barbera, who was Mr. Thomas' appraiser, and Paul Elkins, an appraiser employed by the IRS. By the time of the hearing, the Debtors had increased their own estimate of the value of their assets to $13,000, consisting of the $3,000 they already acknowledged plus an additional $10,000, representing the liquidation value of the stock. For the most part, the evidence presented at the hearing is not disputed.

Charles Thomas testified that since 1990 he has operated a courier service out of an office in Abington, Pennsylvania, under the moniker All American Courier, Inc. ("All American"). The business is a rush, same-day delivery service. Thomas incorporated the business under Subchapter S in 1995, and is the sole owner of the stock. Although the business uses drivers to make pick-ups and deliveries, the drivers operate as independent contractors and are not employees of the corporation. Thomas is the only employee. He described his role in the business as being an intermediary between a group of customers and a group of drivers. The customers contact All American for delivery services and Thomas' job is to takes their calls and assign the work to drivers. The drivers are paid on a commission basis and receive anywhere from 50 to 75% of the price for each job depending on the circumstances.

The business has about 15 to 20 regular customers who can be expected to call for services at least once a month. The largest of these customers is ADP, a data processing company that is a major supplier of payrolls for businesses throughout the Philadelphia region. ADP uses All American to make multiple deliveries on a daily basis. ADP does not, however, use All American exclusively and has no long term contractual obligation to use All American at all. In total, 60 to 70% of All American's business is derived from ADP.

Thomas testified that he solicited All American's customers and that in just about all instances he personally receives their requests for service. When customers call All American, they speak directly to Thomas, who either answers the phone or quickly returns voice mail messages. Thomas then personally makes arrangements for customers' deliveries. Thomas indicated that when regular customers call All American they expect to speak to him directly and use All American because of the trust and confidence they place in his ability to have their packages delivered as needed. Thomas' relationship with ADP has evolved to the point where he sometimes contacts ADP in advance to coordinate anticipated deliveries. While acknowledging that drivers tend to have a high turnover, Thomas indicated that they too possess a level of loyalty to him because he treats them with respect. Thomas believes that if he were not there to answer the phone and personally direct deliveries, customers would be less likely to use All American. Likewise, Thomas believes that if his customers and drivers knew he was working elsewhere, they would be likely to use and remain associated with him based on the consistency of their established relationship. Thus, Thomas testified that if he were to lose ownership of All American he would be able to immediately restart the business by contacting All American's customers and drivers and informing them of his new operation. Ostensibly, this testimony was offered to show that All American's earning power was premised on his personal services, as opposed to any value intrinsic to the corporation.

Regardless of where the value lies, it is certain that Thomas' efforts have paid off in the form of burgeoning revenues. Since 1992, All American's revenues have grown at the following robust rate:

| Year | Gross Receipts |
|------|----------------|
| 1992 | $100,483 |
| 1993 | $158,644 |
| 1994 | $135,509 |
| 1995 | $178,587 |
| 1996 | $194,360 |
| 1997 | $250,949 |

Stipulation of Facts, Exhibit "C," at 9. Receipts for 1998 are estimated to be in the range of $310,000. The net income to Thomas over this same period also increased:

| Year | Net Income |
| --- | --- |
| 1992 | $ 9,022 |
| 1993 | $35,386 |
| 1994 | $43,131 |
| 1995 | $55,452 |
| 1996 | $59,948 |
| 1997 | $68,124 |

Stipulation of Facts, Exhibit "C," at 10.

Despite these growing revenues, Thomas indicated that it was incorrect to value the business based on its income. He insisted that the business' ability to produce income was the result of his personal services and was not transferable to another owner. Mr. Barbera, a Certified Public Accountant, offered expert testimony in support of Thomas' position, stating that All American's income was not indicative of the business' value because the revenues flowed exclusively from Thomas' personal efforts. If Thomas simply set up his delivery service as a sole proprietorship the income stream enjoyed by All American would largely shift over to Thomas and the corporation would become worth very little. On this basis, Barbera concludes that All American has no independent value as a going concern and can only be appraised on the liquidation value of its assets, which he estimated to be about $10,000.

Paul Elkins, who is also a Certified Public Accountant, prepared the IRS's appraisal of All American at $56,000 and testified in support of it. Because All American was an operating business, Elkins rejected the use of a liquidation analysis since that method of valuation was not designed to take account of the business' goodwill or worth as a going concern. Elkins also rejected the use of a market based valuation since All American's stock is not openly traded. He chose instead to perform an income analysis to calculate the price an investor would be willing to pay to purchase All American's stock based on its projected rate of return. Elkins' analysis proceeded by extrapolating the business' revenues over the next five years (a period which also coincided with the duration of the Debtors' plan), discounting that amount for present value plus risk factors, and then discounting the amount again for lack of marketability of the stock.

Employing this analysis, Elkins projected All American's total net revenues to be $156,623. He then calculated a discount factor of 29.12%, to account for the time value of money and various risk factors arising from the operation of a small business, including a discount of 10% as a company specific risk factor representing the "[p]robability of [c]ontinued performance and growth after [a]cquisition" for All American. Stipulation of Facts, Exhibit "C," at 13. After applying the discount separately to the projected income figures for each year, Elkins arrived at a present value of $85,626. He then discounted that figure by 35% for lack of marketability of the stock to arrive at a final value of $55,656, which he rounded to $56,000 to reach a final projected sale price. On cross examination, Elkins admitted that he did not separately calculate the value of a covenant not to compete in making his valuation, and he agreed with Debtors' counsel that the going concern value of All American could be wiped out if Thomas used his contacts to immediately start up a new courier service following a sale of All American.

The Debtors dispute the validity of Elkins appraisal. The Debtors argument, however, is not focused so much on the accuracy of the appraisal as it is on the underlying legal assumption that the stock's present value can be influenced by the Debtor's after acquired earnings. Because the Debtors characterize their income from All American as arising from the personal services of Charles Thomas, they assert that the income is neither property of the estate nor subject to being

encumbered by a prepetition lien. In support of their argument, the Debtors cite to venerable Supreme Court authority in *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), for the proposition that a debtor's postpetition earnings are his own and may not as a matter of federal bankruptcy law remain subject to a prepetition lien. The Debtors carry their argument so far as to invoke the XIII Amendment to the Constitution and suggest that the IRS is forcing them into a form of involuntary servitude by placing a lien on what they characterize as a portion of their future earnings.

## DISCUSSION

The Court begins its analysis of the Debtors' argument by observing that it is not inappropriate for debtors in Chapter 13 to be required to use postpetition earnings from personal services to payoff prepetition debts. Indeed, the very purpose of Chapter 13 is to allow debtors the option of voluntarily using postpetition income to pay debts. 8 Collier on Bankruptcy ¶ 1300.02 (Lawrence P. King ed., revised 15th ed.1998) ("[c]hapter 13 is designed to facilitate adjustments of all types of debts of individuals with regular income through extension and composition plans funded out of *future income....* ") (emphasis added) ["Collier"]. To that end, section 1306(a)(2) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330, specifies that "earnings from services performed by the debtor after the commencement of the case" become property of the estate in Chapter 13. *See also* 8 Collier ¶¶ 1306.01–.02[3]. The Debtors' contentions to the contrary are fundamentally flawed.

The Debtors are correct, however, in their recognition that a prepetition tax lien to secure the payment of dischargeable taxes does not extend to a debtor's postpetition, after-acquired property. Where the underlying tax debt is discharged, debtors may keep and acquire property postpetition free of the lien. *United States v. Sanabria,* 424 F.2d 1121, 1123 (7th Cir.1970); *Anderson v. United States (In re Anderson),* 149 B.R. 591, 594–95 (9th Cir. BAP 1992); *Pansier v. United States,* 225 B.R. 657, 661 (E.D.Wis.1998); *Dishong v. United States (In re Dishong),*

188 B.R. 51, 55 (Bankr.M.D.Fla.1995); *Wessel v. United States (In re Wessel),* 161 B.R. 155, 159 (Bankr.D.S.C.1993). With that rule in mind, the issue in the instant case may be articulated as whether the value of the IRS's lien on the Debtor's stock in All American can be influenced by the company's goodwill and going concern value where the measure of these items is based upon and will by paid out of the company's postpetition income?

An examination of analogous cases suggests that the answer is yes. The status of a debtor's postpetition earnings is the subject of a line of cases analyzing the application of the personal services exception in section 541(a)(6) to individual debtors in Chapter 11. Section 541(a)(6) is the provision of the Bankruptcy Code that excludes from the estate proceeds derived from a debtor's personal services after filing bankruptcy and is in part a codification of the Supreme Court's holding in *Local Loan Co. v. Hunt,* 292 U.S. at 243, 54 S.Ct. 695. Although the reported decisions differ greatly in their approach to this issue, most of the cases differentiate in some way between income derived from a debtor's personal services and income derived from other sources including prepetition assets and a debtor's goodwill.

The case most on point is *In re Prince,* 85 F.3d 314 (7th Cir.1996), in which the court concluded that the goodwill and going concern value of an orthodontist' stock in the professional corporation through which he practiced was a prepetition asset that became a part of the debtor's bankruptcy estate. The debtor filed for bankruptcy under Chapter 11 and proposed a plan which required him to pay creditors the equity value of his practice. Following confirmation, the value of the stock became a matter of dispute. The debtor maintained that the stock was worth no more than $7,500, which was the corporation's liquidation value, whereas the creditor's committee maintained that the stock was worth up to $650,000 based on a capitalization of the corporation's projected cash flow.

The court held that the value of the stock had to include the corporation's goodwill and going concern value and rejected all of the debtor's arguments to the contrary. The

court observed that liquidation value could not be used because it did not accurately measure the worth of a corporation that was continuing in operation and would earn future income. Therefore, the court held that the value of the stock had to take account of the present value of anticipated income. *See also Associates Commercial Corp. v. Rash,* —— U.S. ——, —— – ——, 117 S.Ct. 1879, 1885–86, 138 L.Ed.2d 148 (1997) (holding that property should be valued under 11 U.S.C. § 506 in accordance with a debtor's proposed use thereof).

The debtor argued that the expectancy of future income could not be counted upon because of the lack of a noncompetition agreement. There was nothing to prevent the debtor from selling out and starting a new practice. The court rejected this argument, holding that the lack of a noncompetition agreement did not render the stock worthless. The court observed that the corporation's value had to be measured as of the time of confirmation of the plan and not from the perspective of some hypothetical date in the future at which the debtor may leave the corporation and enter into competition with it. The possibility that the debtor could one day leave the corporation was a factor that could lower the value of the stock, but it was not certain to occur and thus should not render the stock worthless. The court also observed that the insertion of a covenant not to compete in an agreement to sell the practice should not effect the stock's value. The role of such a covenant, observed the court, was not to enhance or detract from the value of the stock, but to preserve the value so that it would be worth as much in the hands of a buyer as it is worth in the hands of the seller.

The court further held that the debtor's goodwill was an asset separate and apart from himself that existed prepetition and was capable of being transferred to another:

Dr. Prince's [the debtor's] innate physical ability, his personality, or his professional degree increase the market value of his services, but they cannot be sold to another orthodontist; they have value only as attributes of Dr. Prince. On the other hand, Dr. Prince's goodwill, like the practice's physical equipment, can be sold and transferred, and once sold and transferred can generate value for another orthodontist. Although the mechanism of using his best efforts to transfer his patients' loyalties ... with a covenant not to compete is not as simple as signing over title to a physical asset, the functional effect is the same. Dr. Prince could sell and deliver his goodwill to [another who could then] reap the value of the asset. Thus, Dr. Prince's goodwill is not intrinsically part of his human capital, but rather is a separate intangible capital asset of the practice, like a trademark would be.

... *The value of Dr. Prince's goodwill represents future cash flows not from earnings for future services actually performed by Dr. Prince, but from return on an intangible capital asset that could be sold and transferred with the sale of the practice.* The value of Dr. Prince's goodwill is therefore not excluded from the estate by virtue of § 541(a)(6), and according to the plan of reorganization it must be paid by the Princes into the creditors fund.

*Prince,* 85 F.3d at 323–24 (emphasis added, footnotes omitted).

Another leading case is *FitzSimmons v. Walsh (In re FitzSimmons),* 725 F.2d 1208 (9th Cir.1984), in which the court held that the postpetition income of an attorney practicing as a sole proprietor could be divided between income received as a direct result of his personal services and income received from other sources. The court ruled that income "attributable ... to the [firm's] invested capital, accounts receivable, *goodwill,* employment contracts with the firm's staff, client relationships, fee agreements or the like, ... accrue to the estate." *Id.* at 1211 (emphasis added). Thus, according to this opinion, the 9th Circuit viewed the firm's goodwill to be an asset distinct from the debtor even though the debtor operated his law firm as a sole proprietor.

Consistent with the holdings in *Prince,* 85 F.3d at 314, and *FitzSimmons,* 725 F.2d at 1208, the trend in this line of cases favors the classification of at least a portion of a debtor's postpetition earnings as estate property. *In re Angobaldo,* 160 B.R. 140 (Bankr. N.D.Cal.1993) (following *FitzSimmons* and

concluding that 15% of sole proprietorship's earnings resulted from efforts not attributable to the personal services of the debtor); *In re Harp,* 166 B.R. 740 (Bankr.N.D.Ala. 1993) (interpreting section 541(a) in manner that required all of individual Chapter 11 debtor's postpetition income to be property of the estate); *In re Herberman,* 122 B.R. 273 (Bankr.W.D.Tex.1990) (same) *cf. In re Lundeen,* 207 B.R. 604 (Bankr.S.D.Ind.1997) (concluding that all earnings attributable to podiatrist who worked solely as an employee for an entity in which he did not have an equity interest and which paid him a salary were derived from his personal services). *Contra In re Cooley,* 87 B.R. 432 (Bankr. S.D.Tex.1988) (holding that individual Chapter 11 debtor's postpetition income from services rendered in sole proprietorship including income attributable to debtor's goodwill was excluded from estate as earnings from personal services under section 541(a)(6)). For present purposes it is sufficient to observe that in each of these cases the courts carefully examined the components of the debtors' postpetition income and included within the estate that portion of the income that was traceable to sources other than the debtor's personal services.

■ Another analogous line of cases addresses the status of postpetition income derived from prepetition events. The general rule is that income rooted in a debtor's prepetition past belongs to the estate even when it is received postpetition. *Kokoszka v. Belford,* 417 U.S. 642, 647–48, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974); *Andrews v. Riggs National Bank,* 80 F.3d 906, 910 (4th Cir.1996); *In re Barowsky,* 946 F.2d 1516, 1517 (10th Cir.1991); *In re Glenn,* 207 B.R. 418, 422 (E.D.Pa.1997). Under this rule, postpetition tax refunds derived from prepetition income are always held to be property of the estate. *Kokoszka,* 417 U.S. at 647–48, 94 S.Ct. 2431; *Barowsky,* 946 F.2d at 1517. Similarly, postpetition payments related to prepetition insurance sales are considered to be estate property. *In re Blackerby,* 208 B.R. 136, 143–44 (Bankr.E.D.Pa.1997). In *In re Andrews,* 80 F.3d 906, 911–12 (4th Cir.1996), the court even held that payments received pursuant to a prepetition covenant not to compete were rooted in the past, stemming from the prepetition sale of the debtor's business, and therefore had to be included in the estate.

■ These cases demonstrate that future income can be estate property based on its relationship to past events. With respect to All American, it is clear that the goodwill and going concern value of the business are rooted in Thomas' prepetition efforts to develop a rapport with customers and build his business. The present value of All American may be measured by the company's ability to earn income in the future, but the ability to produce that income is the product of past effort. Thomas' assertion that All Americans' future earnings represent a purely postpetition asset is faulty to the extent it overlooks the prepetition effort that went into the creation of All American and its current goodwill with customers.

■ For purposes of both bankruptcy law and the Internal Revenue Code, property interests are created by state law, *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), and thus state law must be referenced to ascertain the precise nature of Thomas' interest in All American. Goodwill is recognized in Pennsylvania as an alienable interest in property. *1412 Spruce, Inc. v. Commonwealth of Pennsylvania,* 504 Pa. 394, 400, 474 A.2d 280, 284 (1984); *Geisinger Clinic v. Di Cuccio,* 414 Pa.Super. 85, 103, 606 A.2d 509, 518 (1992). The Pennsylvania courts define goodwill as the positive reputation a business may enjoy in the eyes of the public that creates a probability that old customers will continue their patronage. *Butler v. Butler,* 541 Pa. 364, 378, 663 A.2d 148, 155 (1995). Certain limitations on the transferability of goodwill are recognized, however, in the context of Pennsylvania domestic relations law. Pennsylvania courts distinguish between the goodwill that is intrinsically tied to the attributes and skills of an individual from the goodwill that can become associated with a business separate and apart from the people involved in the business. The distinction is explained by the Pennsylvania Supreme Court as follows:

If the nature of the economic goodwill is purely personal to the professional spouse, it is not alienable; hence, it cannot actually be realized and may not be included in the equitable distribution. If, however, a portion of the economic goodwill is attributable separately to the corporation or business and can be realized by sale to another (by selling the enterprise in whole or in part, buy-in's and buy-out's included), then to that extent, there is good will value subject to equitable distribution.

*Butler*, 541 Pa. at 379, 663 A.2d at 155–56 (*quoting Fexa v. Fexa*, 396 Pa.Super. 481, 487, 578 A.2d 1314, 1317 (1990)). As intimated in the above quote, the rule is particularly associated with professionals who in divorce proceedings are generally determined to hold only personal goodwill unless their spouse is able to demonstrate otherwise. *See Butler*, 541 Pa. at 364, 663 A.2d at 148 (holding that goodwill of accountant was purely personal and not subject to equitable distribution); *McCabe v. McCabe*, 525 Pa. 25, 575 A.2d 87 (1990) (holding that attorney had no recognizable goodwill in law firm where partnership agreement prohibited him from realizing upon firm's goodwill on withdraw); *DeMasi v. DeMasi*, 366 Pa.Super. 19, 530 A.2d 871 (1987) (goodwill of physician determined to be personal and not subject to equitable distribution); *Beasley v. Beasley*, 359 Pa.Super. 20, 518 A.2d 545 (1986) (goodwill of attorney found to be purely personal and not subject to equitable distribution); *cf. Buckl v. Buckl*, 373 Pa.Super. 521, 542 A.2d 65 (1988) (goodwill of an architectural partnership was subject to equitable distribution where the firm had a reputation that was distinct from any of its partners or associates); *Ullom v. Ullom*, 384 Pa.Super. 514, 559 A.2d 555 (1989) (goodwill of auto dealership included in equitable distribution).

█ The goodwill at issue in the present case is not of the same type enjoyed by a professional person that is likely to be deemed inalienable. Prospective patients or clients are influenced to seek out a certain doctor, lawyer, accountant, architect, or similar professional, as a result of the person's reputation for possessing specific and highly individualized skills based on the professional's training and experience, that allows him or her to offer a unique service. Such skills might include the ability to perform a certain life saving operation, win difficult trials, save money on taxes or design buildings that are characterized by a particular aesthetic quality. The goodwill claimed by Charles Thomas is not of that nature. Thomas testified that customers give him repeat business because they trust his ability to reliably arrange for the pick up and delivery of their parcels in a timely fashion. The ability to perform this service does not involve the type of specialized skill or judgment that is so individualized it is incapable of being transferred to another. With Thomas' involvement, the Court finds that a purchaser could take over All American and retain its reputation for reliable service.

In view of this finding, the court concludes that the goodwill All American enjoys by virtue of Thomas' services constitutes a distinct property interest under state law. All American's goodwill is an item of property separate from the income Thomas receives from the performance of personal services, and it is wholly appropriate that it be included in any valuation of All American's stock.

The Court is not persuaded by Thomas' assertion that he is free to destroy the value of All American by leaving the corporation and re-establishing the business as a sole proprietorship. This assertion is at the heart of Thomas' argument that the goodwill possessed by All American is so personal to him that the business is worth no more than its liquidation value. Under one variation of this argument, Thomas posits that he could simply leave the corporation and operate the business as a sole proprietor bringing all of the customers with him. Under this scenario the argument is illusory because the value of the business is in reality being retained by Thomas who is simply transferring it from the corporation to himself. The stock would go down in value, but the business would be worth the same. In fact, the business, even as a sole proprietorship, would continue to be a prepetition asset subject to the IRS's lien.

█ Under another scenario of the same argument, Thomas proposes that he could sell the corporation but nevertheless continue

the business as a sole proprietorship by immediately contacting all of his prior customers and drivers and informing them of his new operation. Thomas assumes that he is free to engage in this conduct in the absence of a noncompetition agreement and criticizes Elkins' appraisal for failing to account for the effect of such an agreement on the price of the stock. Thomas' assumption, however, is in error. Elkins' appraisal was certainly predicated on the idea that All American's goodwill would be part of any transaction in which the business is sold. What Thomas fails to realize is that even in the absence of a noncompetition agreement the law prohibits the seller of a business from engaging in conduct detrimental to the business' goodwill. *Felt v. Hope*, 416 Pa. 118, 122, 206 A.2d 621, 623 (1964) ("we agree with the proposition that a sale of goodwill requires that the seller should do nothing which directly tends to deprive [purchaser] of its benefits and advantages") (brackets in original, internal quotes omitted); *Wentzel v. Barbin*, 189 Pa. 502, 42 A. 44 (1899) (holding that seller of paper route was not thereafter at liberty to sell papers in territory of route); *see also Karsh v. Haiden*, 120 Cal.App.2d 75, 83, 260 P.2d 633, 637 (1953); *Alexander & Alexander, Inc. v. Danahy*, 21 Mass.App.Ct. 488, 496, 488 N.E.2d 22, 28 (1986); *Slomin's Inc. v. Gray*, 176 A.D.2d 934, 935, 575 N.Y.S.2d 545, 547 (1991); *Dillion v. Anderson*, 358 S.W.2d 694, 696 (Tex.Civ.App.1962); *Maola Ice Cream Co. v. Maola Milk & Ice Cream Co.*, 238 N.C. 317, 321, 77 S.E.2d 910, 914 (1953); 38 Am.Jur.2d *Goodwill* § 19 (1968).[2] Upon selling a business, in a transaction including the business' goodwill, the seller is thus not free to immediately turn around and solicit his former customers or otherwise rely upon the former business' goodwill in the pursuit of another enterprise.

Thus, in the absence of a noncompetition clause, Thomas could continue to engage in the rush, same-day delivery business, but he would be prohibited from usurping the goodwill of All American. It would be unlawful for Thomas, as proposed in his argument, to immediately engage in a targeted effort to solicit All American's customers by representing to be a successor or continuation of his old company. The Court therefore finds no merit in Thomas' argument to the contrary. Moreover, the Court does not believe that the cost of a noncompetition clause would have an appreciable impact on the sale price of the business as calculated by Elkins. As pointed out by the Seventh Circuit in *Prince*, 85 F.3d at 322, the reason for including a noncompetition clause would be to preserve the business' value upon being transferred to a purchaser. As the Court understands Elkins' appraisal, it attempts to ascertain the amount a purchaser would be willing to expend to acquire All American's income stream, and assumes a transaction in which every component of value necessary for the continuation of All American is included in the transfer. Thus, even though Elkins did not expressly mention it, his appraisal already accounts for the value of a noncompetition clause.

The same rules apply if Thomas were to propose a plan to surrender his stock in All American to the IRS under section 1325(a)(5)(C). By surrendering the stock, Thomas would be effectuating a transfer of All American's assets to the IRS, including its goodwill. After the transfer, Thomas would thus be precluded from building a new business by trading on the goodwill All American possessed. If Thomas nevertheless did so, the IRS's lien would attach to his new business to the extent that it was a continuation of All American.

## CONCLUSION

The Court finds that the IRS properly valued Charles Thomas' interest in All American based on the business' value as a going concern, which includes its goodwill. All American's goodwill is not so personal to Thomas that it could not be transferred,

---

2. To the extent it is relevant, the Court finds the case of *Denawetz v. Milch*, 407 Pa. 115, 178 A.2d 701 (1962) to be distinguishable. The *Denawetz* case involved the dissolution of a partnership rather than the sale of a business and concerned the interpretation of an agreement of dissolution that did not specify which partner was to retain the partnership's goodwill. While the court held that it would not imply a restriction on competition where none was included in the dissolution agreement, it took great care to limit its holding to the precise facts before it.

making it appropriate that the goodwill be accounted for in a valuation of the business. The IRS's proof of claim is allowed as filed.